**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| SHAKEEL BAIG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:15-cv-382-WTL-DML |
| ) | |
| STATE OF INDIANA, DEPARTMENT ) | |
| OF TRANSPORTATION, ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendant's fully briefed Motion for Summary Judgment (Dkt. No. 42). The Court, being duly advised, now **GRANTS** the Defendant's motion for the reasons set forth below.

## I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The Plaintiff, Shakeel Baig, brings his Complaint against the Defendant, State of Indiana, Department of Transportation ("INDOT") alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). Baig alleges that he was discriminated against and subjected to a hostile work environment because of his race, religion, and national origin, and that the Defendant unlawfully retaliated against him for complaining of race, religion, and national origin discrimination and harassment.

Baig is originally from Pakistan. He is a practicing Muslim and identifies as Asian. Baig began working for INDOT in 1997. He worked in its Crawfordsville, Indiana division office beginning in 2005. He was hired as a design engineer and received several promotions. His final promotion was to Director of Production, a position that was later renamed Director of Capital Program Management and Director of Program Management. In this position, among other things, he was responsible for identifying projects, looking after the budget, and managing people below him. About five or six people reported directly to Baig, and he directly or indirectly supervised about thirty employees.

Alan Plunkett has held the position of Deputy Commissioner of INDOT's Crawfordsville Division since 2005. Plunkett is of North American descent, does not practice Islam, and is Caucasian. Baig reported directly to Plunkett from 2005 to 2013, when a reorganization took place within INDOT. While Baig and Plunkett continued to work together on projects after the reorganization, Louis Feagans became Baig's supervisor. Feagans is of North American descent, does not practice Islam, and is Caucasian.

**Baig's Performance Reviews**

Baig generally received good performance reviews. Baig received a "Meets Expectations" on his 2009, 2010, and 2012 annual performance appraisals. Baig received a rating of "Exceeds Expectations" on his 2011 annual performance appraisal. His final performance appraisal, completed by Feagans for the year 2013, was also a rating of "Meets Expectations" and included assessments of "Meets Expectations" or "Exceeds Expectations" in every individual category. Feagans completed Baig's "Manager Evaluation" and reported that "Shakeel needs to continue to work on his relationships with his staff and providing them with new challenges and understanding their strengths and needs." Dkt. No. 42-7 at 2.

**Plunkett's Comments and Actions**

Baig mentions numerous negative comments Plunkett made to him over the course of his employment. In 2008, Plunkett first told Baig that Baig was lucky to have a spot on the organizational chart. Plunkett repeated this comment to Baig several times.

In 2008, Plunkett excluded Baig from a National Guard project that had begun in 2006. When Plunkett told Baig that he would not take Baig to a meeting with the National Guard, Plunkett made a comment that he did not want to scare them and "doesn't want them to think there's a terrorist on the ground." Dkt. No. 42-21 at 6. Plunkett also said that Baig would scare the mayor of Lafayette if he were to meet with him.

In 2010, Baig began growing a beard. Plunkett made multiple comments suggesting that Baig should shave his beard, his looked shabby, and that he would look better without the beard. Plunkett also made comments to Baig that the beard made him look like a terrorist. Once, during a staff meeting, Plunkett said that the FBI was watching Baig. Plunkett would tell Baig that he needed to shave his beard or the FBI would pick him up.

Every year to eighteen months when Baig was preparing to fly to Pakistan, Plunkett would tell Baig that he would have a hard time getting through security coming back from Pakistan. Baig last flew to Pakistan in 2013. When Baig would return from Pakistan, Plunkett would say, "So I guess they let you go." Dkt. No. 42-21 at 9.

Plunkett also asked Baig several culturally insensitive questions. For example, he asked Baig if he was allowed to marry four wives and whether he would "get seventy virgins" if he killed someone. Dkt. No. 42-21 at 30. Plunkett asked Baig if he was required to wear a beard to return to Pakistan and if his wife was required to cover her whole body in Pakistan. He also asked if Baig knew Osama Bin Laden. Plunkett also made comments about "nuking" Muslims and Muslim countries and opined that there should be stricter TSA security for Muslims at the airport.

In 2011 or 2012, Plunkett called Baig into his office and asked Baig if it was a cultural thing to throw used toilet paper on the floor rather than dispose of it in the toilet. When the issue came up again at a staff meeting, Plunkett again asked Baig if it was part of his culture to throw toilet paper on the floor. Plunkett also accused Jawed Bari, a Muslim employee from India, of throwing toilet paper on the floor. In May 2014, Bari overheard Plunkett say, "these foreigners, these brown people, they think they are very smart people, but they are not, they are shit." Dkt. No. 48-7 at 2. Plunkett also threatened Baig with "consequences" after Baig hired Bari.

Right after President Obama was elected, Plunkett made the comment that black people thought they would get a free ride because there was a black president and that deep down he thought President Obama was a Muslim. Baig found Plunkett's comments about President Obama being a Muslim to be in a negative tone. Between 2009 and 2014, Plunkett made racial

4

comments about President Obama five or six times. The comments were made in a tone such that Baig believed that Plunkett did not like African-Americans.

Further, Plunkett made comments about Baig's accent and pretended that he could not understand Baig. Baig was told by two other people that Plunkett and Joe Lewein, another employee, were making fun of his accent. Although Plunkett did not have any problems pronouncing Baig's name, he did have difficulty with the names of two other employees—Noor Afrin and Asfahan. Plunkett commented that he wished they would use nicknames that he would find easier to pronounce.

Baig usually did not tell Plunkett that his offensive comments upset him because Plunkett told Baig he did not forget things, and Plunkett would sometimes get very angry with Baig, leading Baig to fear retaliation.

Plunkett would go to Baig's employees to inquire whether Baig was "doing anything wrong." Dkt. No. 42-21 at 6. He did not ask Baig's counterparts, such as Bruce Conrad and Mark Albers, or his counterparts' employees, about what they were doing. Plunkett did not give Baig a computer camera for web-conferences, as other individuals had. Plunkett would give Baig the worst cars in the district for his department, and his employees were always having trouble with the cars. This created hurdles that affected Baig's productivity. Plunkett also allowed Baig's direct reports to bypass Baig and go directly to Plunkett, while direct reports of others were not allowed to do this.

**Facts Related to Baig's Reporting**

Sarita Vanderbilt started working as INDOT's Human Resource Manager in Crawfordsville in 2008. Baig complained to Vanderbilt in 2008 about Plunkett's behavior toward him. He said that he had begun to feel uncomfortable with Plunkett in 2006. Baig had many

5

conversations with Vanderbilt during which he told her that he was not feeling comfortable, and it seemed as though Plunkett wanted to terminate him and was looking for a reason to do so. He told her about the comments that Plunkett would make. Baig also complained to Vanderbilt about Plunkett's questions about the toilet paper on the floor and Plunkett's derogatory comments about President Obama. Baig told Vanderbilt he found the comments insulting.

Soon after Vanderbilt began working in the Crawfordsville office in 2008, she and Baig discussed possible discrimination by another employee, Joe Lewein. Vanderbilt and Baig thought that Lewein was unprofessional, condescending, and demeaning toward Baig and Vanderbilt. Lewein also made comments supporting Plunkett's statements. Baig talked to Vanderbilt about comments about Alex, Asfahan, and Noor. Baig also discussed with Vanderbilt that he had asked Plunkett for a camera for video conferences, but not been given one.

Although Baig complained about Plunkett to Vanderbilt, Baig never filed a formal complaint. He never put any of his complaints in writing, although he may have complained to her in an e-mail. He believed that, as the HR person, she would guide him if he needed to file anything in writing, but he was not directed to do so.

**Complaint by Kohl**

In June 2014, Travis Kohl complained to Plunkett that Baig had yelled at Kohl in front of others.[1] Kohl also complained to Trevor Mills, his supervisor, who told Kohl to report the incident to the State Personnel Office. Kohl sent a complaint to Ricky Fox in the State Personnel Office on June 10, 2014. In that complaint, Kohl reported what he termed "behavior I genuinely find hostile and am now in a position I don't feel my job is in jeopardy to report." His e-mail described an event on June 5, 2014, when Baig became loud, aggressive, and emotional toward

---

[1] Baig does not dispute that this complaint and additional complaints made during the investigation were made, although he denies the accuracy of the complaints.

Kohl in front of others. He then described an "uncomfortable encounter" in which Baig's tone was "aggressive and emotional." He indicated that these incidents were not isolated, but rather reflected regularly occurring behavior by Baig. He stated that Baig had threatened others, including Melissa Patton, Richard Gilyeat, Afrin, and several former employees. Dkt. No. 42-8 at 1.

Kohl's complaint triggered an investigation. Even before the complaint was filed, Feagans was aware that Baig and Kohl had issues. Feagans tried to get Baig and Kohl to work out their differences, and he enlisted Plunkett to try to help them do so. Feagans also had heard complaints about Baig before the complaint was filed, but he had not been able to have the opportunity to speak privately with other employees to investigate them.

Vanderbilt did not conduct the investigation into Kohl's complaint. Rather, because the complaint was filed with the State Personnel Office, Fox conducted the investigation.

**Fox's Investigation and Report**

Fox's investigation yielded many complaints about Baig. Fox interviewed INDOT employees Kohl, Mary Beth Redden, Patton, Mike Wink, Marcie Jeffers, Afrin, Deb Switzer, Mark Albers, Mills, and Baig. Fox reported that Kohl said that Baig's behavior was frequently offensive. Fox reported that when he interviewed Mary Beth Redden, she started to cry, stating that she "just wish[ed] things would calm down" and that "the tension would decrease." Dkt. No. 42-10 at 2. She reported that Baig "treats [people] pretty well, but that he expects a person to do their job." *Id.*

Fox reported that Patton stated that Baig "would get angry and take everything personal." Dkt. No. 42-10 at 3. She said Baig was frequently "on" Richard Gilyeat. *Id.* Fox reported that Jeffers said she was "almost ready to quit her job under Baig," and that he "was disrespectful and

7

that he would not allow employees to chit chat about things." *Id.* She described the environment as "tense," and said that she would use sick days to avoid coming to work. She stated that it "was an awful place to work because of Baig." *Id.* Fox reported that Afrin described Baig as "tough, fair, and uses very direct language when communicating. She said she was never offended about anything he [did.]" *Id.* at 4. Switzer reported that Baig "was very disrespectful towards employees [and] she had been called into his office two times and he did nothing but yell at her." *Id.* Fox issued a summary of his investigation and recommended that Baig be demoted to a non-managerial position or be terminated. *Id.* at 4.

### Additional Employee Opinions About Baig

In response to the instant motion, Baig has submitted declarations from INDOT employees Tammy Turnbull, Bari, and Renee Neukam. None of these employees was interviewed by Fox. Turnbull said that Baig was very considerate and polite, and she could not recall him yelling or being disrespectful to anyone. Bari said Baig was a very high performing person and very fine manager, and if Baig was disliked, it was because not everyone at INDOT wanted to work hard all the time. Neukam said Baig was very professional and fostered a very professional, accountable atmosphere, and that she never experienced any issues of being yelled at or mistreated. She indicated if people got upset with Baig, it was because he held them accountable for their actions.

### Feagans

In June 2014, Feagans was aware that Baig had issues with Plunkett, particularly that Baig thought Plunkett was "harassing" Baig by trying to get Kohl and Baig to work out their differences, and Baig thought that Plunkett was not listening to him. Dkt. No. 42-23 at 9.

Feagans went to lunch with Plunkett and Baig sometime in either late May or early June 2014 in an effort to improve their relationship.

Feagans did not have any discussions with Plunkett about the investigation of Baig until Baig's termination was being considered. Specifically, the night before Baig's termination, Feagans told Plunkett that if Baig did not have satisfactory responses to questions, he would likely be terminated. Plunkett expressed his opinion that he preferred that Baig be demoted or relocated.

Feagans met with Baig and Jeff Sullivan on the morning of June 25, 2014. Later that day, Feagans sent Baig a Memorandum with the subject line "Dismissal for Unprofessional Behavior in the Workplace." Dkt. No. 42-11 at 1. The memo reads, in relevant part:

> A meeting was held this morning with the following persons in attendance, Louis Feagans, Jeff Sullivan, and yourself. The purpose of the meeting was to discuss allegations of poor judgment and unprofessional conduct in the workplace. This meeting was the result of an investigation regarding allegations of unprofessional treatment of employees, and subsequently inappropriate conduct during the investigation. As a result of the internal investigation and our discussion this morning, it is my determination that the allegations have been substantiated. Your behavior does not meet the standards of conduct INDOT expects of its managers, and cannot be tolerated.
> For the reasons listed above, you are hereby notified that effective immediately, your employment with the Indiana Department of Transportation is terminated . . . .

*Id.*

Feagans identified the following main reasons for Baig's termination: "[t]reatment of employees, decision-making, Core 4, . . . respect of employees, ownership of staffing." Dkt. No. 42-23 at 5. Feagans pointed to Baig's inability to make even simple, entry-level position decisions as evidence of Baig's inability to take ownership of staffing issues. Feagans also indicated that Baig had a decision-making problem. He provided as an example the fact that Baig

9

cost INDOT money because of poor timing in providing notice for open bidding and the start of a project.

Baig filed a complaint with the Indiana Civil Rights Commission on July 23, 2014, and the United States Equal Employment Opportunity Commission ("EEOC") on July 31, 2014. The EEOC issued its Dismissal and Notice of Rights on December 8, 2014.

### III. DISCUSSION

Baig asserts claims for hostile work environment, discrimination, and retaliation. The Defendant moves for summary judgment on each of these claims.

#### A. Hostile Work Environment

The Defendant argues that Baig's hostile work environment claim is time barred to the extent that it is based on events occurring before Fall 2013. Baig has not responded to this argument. "Section 2000e-5(e)(1) requires that a Title VII plaintiff file a charge with the Equal Employment Opportunity Commission (EEOC) . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 104-05, (2002) (citing 42 U.S.C. § 2000e-5). In *Morgan*, the Court explained that under the continuing violation doctrine, acts contributing to a hostile work environment involve "repeated conduct" that "may not be actionable on its own." *Morgan*, 536 U.S. at 115. Instead, "[s]uch claims are based on the cumulative effect of individual acts." *Id.* In such cases, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *see also Hildebrandt v. Illinois Dep't of Nat. Res.,* 347 F.3d 1014, 1027 (7th Cir. 2003). The Court concluded that the "incidents constituting a

hostile work environment are part of one unlawful employment practice." *Morgan*, 536 U.S. at 118.

The Seventh Circuit has explained that a continuing violation may exist under three circumstances, where: (1) "an employer makes employment decisions over time that make it difficult for the employee to determine the actual date of discrimination"; (2) the employee's claim "involves an express discriminatory policy of the employer"; or (3) "discrete acts of discrimination are part of an ongoing pattern and at least one of the discrete acts occurred within the relevant limitations period." *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707 (7th Cir. 2002). Baig has not pointed to facts that would support a finding that either of the first two theories applies. As such, the Court must look to the evidence of record that would demonstrate that a discrete act of discrimination occurred on or after October 3, 2013, which is 300 days before Baig filed his EEOC charge.

The record contains one statement by Plunkett that clearly falls within the requisite time frame. Specifically, in May 2014, Bari overheard Plunkett say, "these foreigners, these brown people, they think they are very smart people, but they are not, they are shit." Dkt. No. 48-7 at 2. However, this statement was not directed at Bari—let alone Baig—and Baig has not alleged that he even knew of the alleged statement. *See Russell v. Bd. of Trs. of the Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (internal quotation omitted) ("When harassing statements are directed at someone other than the plaintiff, the impact of [such] second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff."). As such, it cannot serve as a discrete act for purposes of the continuing violation doctrine.

Baig points to additional comments that Plunkett made relating to President Obama's race and African-Americans. He indicates that these comments were made five

or six times from the time of President Obama's inauguration until two or three months before Baig's termination. Again, these comments were not directed at Baig. Further, the comments led Baig to believe that Plunkett does not like African-Americans—a racial group to which Baig does not belong.

Baig points to one comment by Plunkett that Plunkett believed that President Obama was still Muslim deep down. However Baig testified that he was still reporting to Plunkett at the time the comment was made (Dkt. No. 42-21 at 26); as such, the comment must have been made no later than September 2013, when Feagans assumed full supervisory responsibility over Baig.

The comments allegedly made by Plunkett before October 4, 2013, were reprehensible. However, Baig filed his EEOC complaint more than 300 days after the last such comment that he has identified in the record. As such, Baig's hostile work environment claim is time barred, and the Defendant is entitled to summary judgment on that claim.

### B. Discrimination

With regard to a claim of discrimination under Title VII, the fundamental inquiry at the summary judgment stage is, "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The central question at issue is whether the employer acted on account of the plaintiff's [membership in a protected class] . . . .")). In other words, the test "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Here, Baig has not pointed to such evidence. Baig has pointed to no facts to suggest that Feagans, who made the decision to terminate him, made his decision in any way based on Baig's race, ethnicity, or religion. While he points to comments made by Plunkett that could constitute evidence of discrimination, Plunkett did not make the decision to fire Baig. In fact, the Defendant points to undisputed evidence that Plunkett suggested demoting Baig rather than terminating him, but Feagans decided that termination was appropriate. Feagans made the decision following an investigation and report by Fox that brought to light many employee complaints about Baig's behavior. Feagans' memo to Baig regarding the termination referenced Baig's "poor judgment and unprofessional conduct in the workplace [and] unprofessional treatment of employees." Dkt. No. 42-11 at 1.

Viewing the evidence in the light most favorable to Baig, no reasonable juror could conclude that Baig was terminated because of his race, religion, or national origin, and the Court therefore grants summary judgment in favor of the Defendant on Baig's discrimination claim.

### C.     Retaliation

Title VII also prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 2000e-3(a). A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015).

The Court assumes, without deciding, for the purposes of this Entry that the first two elements are satisfied. Baig complained to Human Resources manager Sarita Vanderbilt

beginning in 2008 and continuing until he was terminated in 2014 that Plunkett often made racially and ethnically derogatory remarks in the workplace. Baig also points to his complaint to Feagans. Specifically, in June 2014, he told Feagans that he felt as though he was being harassed by Plunkett to improve his relationship with Kohl. That complaint had nothing to do with discrimination on the basis of Baig's race, religion, or origin. Baig was terminated after he made complaints. A termination is, of course, a materially adverse employment action. *E.g.*, *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007).

      Accordingly, the only element at issue is whether Baig has offered sufficient evidence to create a genuine issue of material fact on whether his complaints caused his termination. Baig points to the suspicious timing between his complaint to Feagans and his termination. However, "suspicious timing alone rarely is sufficient to create a triable issue." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (citation and internal quotation marks omitted); *see also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("[I]t is clear that 'mere temporal proximity' is not enough to establish a genuine issue of material fact." (citation omitted)); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions.").

      Here, Kohl e-mailed a complaint regarding Baig's alleged behavior to the State Personnel Office on June 10, 2014. The resulting investigation brought to light numerous complaints about Baig. Fox provided a summary to Feagans on June 25, 2014, recommending that Baig be demoted or terminated, and Feagans terminated Baig the afternoon of June 25, 2014, after meeting with Baig. Feagans' memo to Baig regarding the termination referenced Baig's "poor

judgment and unprofessional conduct in the workplace [and] unprofessional treatment of employees." Dkt. No. 42-11 at 1.

Under these circumstances, this is not the rare case in which temporal proximity, without more, established a causal connection. *See Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 905 (7th Cir. 2005) (explaining that "numerous incidents brought [employee's] professionalism and ability . . . into question" and thereby undermined any inference of suspicious timing); *Juarez v. Ameritech Mobile Commc'n, Inc.*, 957 F.2d 317, 321-22 (7th Cir. 1992) (holding that the "timing of the complaints, standing alone, d[id] not create a genuine issue as to a causal connection" when plaintiff "presents no evidence to suggest that [those] who complained of her deficient performance were lying or that their motives in making those complaints were improper").

Baig has not pointed to any additional evidence beyond the temporal relation between his complaints and his termination that might support a causal link between the two. In fact, the evidence points in the other direction. As discussed above, results of Fox's investigation brought to light many employee allegations about abusive behavior by Baig. As such, Baig offers no reason to believe that Feagans terminated him because of Baig's complaints.

Additionally, even if Baig had presented circumstantial evidence of a retaliatory motive to establish a prima facie case, the Defendant has offered a nondiscriminatory reason for Baig's discharge—that he was mistreating his employees—and Baig has not demonstrated that there exists an issue of material fact on the question of pretext. *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) ("When confronted with circumstantial evidence of a retaliatory motive, the employer may show that the employee would have been fired even absent his complaints about harassment."). Baig has no evidence that calls the Defendant's reason for

termination into question. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quotation omitted). When "assessing a plaintiff's claim that an employer's explanation is pretextual, [the court does] not . . . second-guess[ ] an employer's facially legitimate business decisions." *Id.* (internal quotation marks omitted). An employer's reasons for firing an employee can be "foolish or trivial or even baseless," as long as they are "honestly believed." *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) (quotation omitted). Here, the record does not contain evidence from which a reasonable factfinder could conclude that a retaliatory motive caused Baig's termination, and the Defendant is entitled to summary judgment on Baig's unlawful retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Dkt. No. 42) is **GRANTED**.

**SO ORDERED: 3/29/17**

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification